**HILL INTERNATIONAL, INC., Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION and New Jersey Transit, Defendants.**

**Civil Action No. 96–3892 (JBS).**

United States District Court,
D. New Jersey.

Dec. 17, 1996.

---

Steven D. Weinstein, Blank Rome Comisky & McCauley, Cherry Hill, NJ, for Plaintiff.

Gerald T. Ford, Landman Corsi Ballaine & Ford, Newark, NJ, for Defendant National R.R. Passenger Corporation ("Amtrak").

·Peter Verniero, Attorney General of New Jersey, Michael J. Gonella, Deputy Attorney General, Department of Law and Public Safety Division, Newark, NJ, for Defendant New Jersey Transit.

## OPINION

SIMANDLE, District Judge:

This matter is before the court upon motion for preliminary injunctive relief in favor of plaintiff Hill International, Inc. ("Hill") against defendants National Railroad Passenger Corp. ("Amtrak") and New Jersey Transit, and upon cross-motions to dismiss, and alternatively for summary judgment, filed by defendants Amtrak and New Jersey Transit. Hill seeks to preliminarily enjoin defendants from negotiating with, awarding, entering into or maintaining any contractual relationship with anyone other than plaintiff regarding the Construction Management Contract for the East End Concourse, Penn Station, New York City. The East End Concourse project is estimated to consume approximately 5 years and approximately $60 million to renovate the East End of the passenger terminal at Penn Station for the benefit of New Jersey Transit. Penn Station is owned by Amtrak, and defendant NJ Transit is funding the renovations. The construction project will be coordinated by the Construction Manager. Defendants Amtrak and NJ Transit are involved in the process of selecting the Construction Manager, which is the contract sought by Hill. Hill was allegedly advised it was a top-ranked firm in this

competition as recently as April 25, 1996, when concerns about Hill's financial stability surfaced. Eventually, after an initial review and the receipt of additional financial information about Hill and other applicants, Amtrak advised Hill on July 11, 1996 that its application package would no longer be considered because the evaluations of the top candidates had been recalculated.

Following the initial preliminary injunction hearing on August 28, 1996, Hill and Amtrak informed the court that they had negotiated an understanding, later memorialized in a letter dated September 4, 1996, under which Amtrak would give further consideration to Hill's financial stability so that Hill would present written information at a special meeting, following which Amtrak would issue a new response. On September 6, 1996, therefore, this Court entered an Order dismissing plaintiff's preliminary injunction motion without prejudice to renewal. This meeting was held on September 27, 1996, and Hill presented further information to clarify and explain its financial situation. On October 10, 1996, Amtrak issued a letter explaining that it was still unimpressed with Hill's financial stability and citing reasons why it would not enter into negotiations with Hill to become the Construction Manager.

Hill then renewed its motion for a preliminary injunction. Additional briefs were submitted and the second hearing was convened on November 8, 1996, when the court heard further oral argument and received additional exhibits upon these motions, including defendants' summary judgment motions. The record is now complete.

This opinion, then, constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P., as required by Rule 65, with respect to plaintiff's preliminary injunction motion, as well as addressing defendants' dismissal motions.

## I. *Procedural History*

Plaintiff Hill International filed its Verified Complaint on August 7, 1996. The Com-

plaint alleges jurisdiction under 28 U.S.C. §§ 1331 and 1349. Venue is proper under 28 U.S.C. § 1391(a) and 1931(b). The complaint alleges that defendants have violated federal procurement law, citing various parts of the D.C. Municipal Code, by failing to evaluate Hill's bid in accordance with the criteria established for the process. Hill alleges it has a "protected right and interest in the award of the Contract" (Compl.¶ 51) and that its right has been infringed by defendants' failure to perform a proper evaluation, especially concerning Hill's financial condition.

Upon plaintiff's motion for emergency relief, a temporary restraining order was denied by the Honorable Mary Little Parell, U.S.D.J., on August 8, 1996. Judge Parell's Order set the matter down for hearing before the Honorable Joseph Irenas, U.S.D.J., on August 15th. It was necessary for Judge Irenas to recuse himself from hearing the case, and the matter was reassigned to me on August 15th. I convened a telephone conference on August 16th, addressing expedited discovery issues and setting a schedule for supplemental briefing, preparatory to the new P.I. hearing date of August 28th. Significant discovery was provided to plaintiff by Amtrak pursuant to the parties' consent confidentiality order, which this court memorialized in the protective order signed August 27, 1996, and filed August 28, 1996. The Protective Order memorialized this court's directives from the August 16th telephone conference and provided that Amtrak shall produce all documents relating to the selection and scoring criteria adopted from the receipt of proposals, the internal grading of the bidders and all documents relating to the re-scoring of plaintiff's financial stability and the criteria for that re-scoring.[1]

The preliminary injunction hearing went forward on August 28th. The court heard arguments of counsel, augmented by the factual record developed for this hearing, including detailed documents about the Con-

---

1. Those documents, since they included sensitive commercial and bidding information, were furnished in the first instance for attorney's eyes only, and have not been revealed to the client, Hill International. When commercially sensitive information about other bidders was discussed in the hearing on August 28th, Hill's employees were excused and that portion of the transcript (approximately 40 minutes) was placed under seal.

struction Manager procurement process, consuming about four hours.[2]

## II. *Standards for Preliminary Injunctive Relief and for Summary Judgment*

As the party seeking preliminary injunctive relief, plaintiff Hill International must meet a demanding burden. A preliminary injunction will be granted only where a party is able to demonstrate to the court's satisfaction that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if an injunction does not issue; (3) the interests of third parties will not be harmed; and (4) the public interest would be served and not harmed if the injunction were granted. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir.1989) (quoting *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir. 1982)). See also *Randolph–Sheppard Vendors v. Weinberger*, 795 F.2d 90, 110 (D.C.Cir.1986); *Washington Metro. Area Transit Comm. v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958). This Circuit has held that the first and second elements must be demonstrated by a moving party in every case in order to permit the grant of a preliminary injunction. "To obtain a preliminary injunction, the moving party must demonstrate *both* [emphasis in the original] a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197 (3d Cir.1990) (quoting *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987)).

The demonstration of probability of success on the merits in the Third Circuit does not require plaintiff to show a certainty of prevailing, but rather it requires the court to find a "reasonable probability of eventual success in the litigation," *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982) (en banc). The Third Circuit's definition of "reasonable probability of success" was concisely stated in *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir.1975):

> "[it] is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits."

Ordinarily, the consideration of plaintiff's likelihood of success on the merits necessitates an examination of the law governing this Amtrak service contract procurement process, for plaintiff fails unless it can first demonstrate that there is some law to apply to this procurement process. Because we have the benefit of a fully developed record, in which all parties have also addressed the dispositive motions of defendants before this court, the record is complete for not only defining the plaintiff's rights but also determining whether the record demonstrates any material issues of fact defeating defendants' positions upon the merits.

A summary judgment motion will be granted if, pursuant to Rule 56(c), Fed.R.Civ. P., the evidence of record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202

---

**2.** The court considered the Verified Complaint together with affidavits submitted on behalf of plaintiff, including the affidavit of Michael Griffin (dated August 5, 1996) and the various financial documents that were provided by Hill to Amtrak, together with the documents discovered by plaintiff from Amtrak attached as Exhibit A to plaintiff's supplemental letter brief dated August 26, 1996, consisting of documents bearing Bates Stamp Nos. A–002, 0015–18, 0021–23, 0029–31, 0052–53, 0064, 0085–86, 0094–108, 0140–143, 0146–0157, 0190–0208, 0225–0231.

The defendants submitted affidavits by Saundra Lautenberg (NJ Transit's Program Manager)

(dated August 12, 1996), the Declaration of John DeVito (Amtrak's Construction Services Buyer) (dated August 21, 1996), the Declaration of Robert J. Ferrigno, Amtrak's newly-appointed Contract Manager for the Construction Manager contract (dated August 13, 1996) and the Declaration of Amtrak's Attorney, Gerald T. Ford, attaching various documents and schedules (dated August 13, 1996). Amtrak also submitted a document bearing Bates Stamp No. A–00161, entitled "East End Concourse CM Services Summary of Cost and Technical Proposals," comparing Hill and the other bidders' scores on the evaluation points and the total price for each bid.

(1986). In the present case, where plaintiff would bear the burden of persuasion at trial, "the moving party may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry its burden of persuasion at trial." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–30 (3d Cir.1995), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the plaintiff's evidence is merely "colorable" or is "not significantly probative" upon an issue for which it bears the burden of persuasion at trial under the law applicable to the case, then the court may grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

■ The court will not further defer action upon defendants' summary judgment motions, pending since August, in order to permit plaintiff to obtain deposition discovery from Amtrak's decision makers, as requested by plaintiff's counsel at the November 8th hearing. First, the party opposing summary judgment on the ground that further discovery is needed must file an affidavit under Fed.R.Civ.P. 56(f) indicating the necessity for such discovery and why it may be material to the party's opposition if obtained; this has not been done. Second, more importantly, depositions of agency decisionmakers are rarely available in cases of judicial review of agency action, as such cases are decided upon the administrative record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–20, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971). Discovery beyond the written record may be justified in limited circumstances not here present, including (1) where the record inadequately explains the agency's actions and thus frustrates judicial review, *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); (2) where the record is incomplete due to loss or inadvertence, see *United States v. Rohm & Haas Co.*, 669 F.Supp. 672, 683 (D.N.J.1987); *United States v. Seymour Recycling Corp.*, 679 F.Supp. 859, 865–66 (S.D.Ind.1987); or (3) where there is a strong showing that bad faith or fraudulent conduct sullied the decision making process, *Seymour Recycling*, 679 F.Supp. at 865–66. The record is indeed complete, all parties having contributed to it. Amtrak has given Hill discovery, pursuant to the confidentiality order, *supra*, that is full and robust in outlining internal decisionmaking, of the type seldom available in most administrative record review cases. Likewise, no showing of bad faith or fraudulent conduct has been made, and discovery is not permitted in this type of case by a disappointed bidder on plaintiff's speculation or surmise that the agency's decisionmakers were biased. Thus, the matter is ripe for decision.

### III. *Plaintiff's Rights in Amtrak's Competitive Process of Procuring a Construction Management Contract*

■ .For purposes of deciding these cross-motions, this court finds that due to Amtrak's unusual status, the federal procurement regulations do not apply to Amtrak. Congress has determined that Amtrak 'shall be operated and managed as a for-profit corporation' and that Amtrak "is not a department, agency or instrumentality of the United States Government." 49 U.S.C. § 24301(a)(2) and (3). Although Congress could assuredly legislate obligations upon Amtrak such as in the area of procurement, it generally has not done so, as the Supreme Court noted in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, ——, 115 S.Ct. 961, 971, 130 L.Ed.2d 902 (1995). There are occasional instances where persons dealing with Amtrak's procurement process are explicitly mentioned in federal statutory law, such as in the Byrd Amendment, codified at 31 U.S.C. § 1352(b)(2), which generally prohibits recipients of federal contracts from using federal funds to pay lobbyists to influence executive or legislative decision-making in connection with awarding a specific federal contract, because the Byrd Amendment broadly defines the term "agency" to include mixed-ownership government corporations such as Amtrak for purposes of this anti-lobbying provision, see 31 U.S.C. § 1352(a). Such stray references to Amtrak for limited procurement related purposes are not understood to convert the entire Amtrak procurement process into a federal procurement process for all other purposes.

The federal procurement regulations do not apply to Amtrak. The Federal Acquisition Regulations cited by plaintiff are set forth in Title 48 of the Code of Federal Regulations. The entities subject to these regulations are set forth in 48 C.F.R. § 1.101, which provides in relevant part as follows:

> The Federal Acquisition Regulations System is established for the codification and publication of uniform policies and procedures *for acquisition by all executive agencies* [emphasis added].

"Executive agency," in turn, is defined in 48 CFR § 2.101 to include the executive and military departments and "any wholly owned Government corporation within the meaning of 31 U.S.C. 9101." Amtrak is not identified as a "wholly owned Government corporation" in the list set forth at 31 U.S.C. § 9101(3). On the contrary, Amtrak is a "mixed-ownership Government corporation." 31 U.S.C. § 9101(2)(A), to which the Federal Acquisition Regulations do not apply.

█ Likewise, defendant New Jersey Transit's acquisition statute does not create particular strictures upon the award of this contract. Although NJ Transit is a beneficiary of this work and is funding it, there is no evidence that NJ Transit has controlled the selection process nor that it will supervise the construction process. This is an Amtrak project upon Amtrak's property in Penn Station, to provide improved access for NJ Transit's trains there, and Amtrak is selecting its construction manager.

Even if New Jersey Transit were the party procuring the Construction Management Contract here, New Jersey law exempts contracts for technical and professional services from the competitive bidding requirements, N.J.S.A. 52:34–9 & N.J.S.A. 27:25–11(g)(2)(b). NJ Transit is to consider "price and other factors" to determine which proposal is most advantageous to the state, N.J.S.A. 27:25–11(c) & 52:34–12. New Jersey law consistently recognizes the financial status of a bidder as a critical factor in State of New Jersey procurements, *Hillside Twp. v. Sternin*, 25 N.J. 317, 323, 136 A.2d 265 (1957). Also, unlike cases cited by plaintiff such as *Trap Rock Industries, Inc.*

*v. Kohl*, 59 N.J. 471, 479–80, 284 A.2d 161 (1971) and *Matter of Honeywell Information Systems*, 145 N.J.Super. 187, 367 A.2d 432, 440 (App.Div.1976), in which a low bidder may be recognized as having an interest in the regularity of the procurement process, the State is afforded broader discretion to consider other factors, especially financial stability; moreover, Hill was not the low bidder in monetary terms but rather one of the highest bidders. Although a top-ranked bidder may have a protected status under New Jersey law—to the extent of being entitled to fair and reasonable treatment and consideration before its status can be revoked—this intent is weaker in the area of professional and technical services as compared to procurement of goods, it is weaker in State procurement generally instead of county and municipal procurement, and it is weaker still in procurements where price and other factors most advantageous to the public are to be considered rather than those where price alone is at issue. Even if one were to assume that New Jersey Transit, and not Amtrak, is procuring these professional construction management services in this competitive procurement process, the highest ranked bidder would have at most a rather insubstantial interest, described as the right to a process free of fraud, corruption, and gross abuse of agency discretion. *Honeywell, supra.*

Although neither the federal or state procurement statutes apply to the Amtrak Construction Manager procurement process, this does not end our inquiry. The Supreme Court has determined that where Amtrak performs a governmental function, Congress may not exempt it from complying with the constitution, and Amtrak is held to be an instrumentality of the United States for purposes of protection of constitutional rights. *Lebron v. National R.R. Pass, Corp., supra*, 513 U.S. at ——, 115 S.Ct. at 972; *accord, Varicon Int'l v. Office of Personnel Mgmt.*, 934 F.Supp. 440 (D.D.C. 1996). In *Lebron*, the Supreme Court held that Amtrak is part of the government for purposes of the First Amendment, because it was created to serve governmental objectives and is operated through a board of directors, a majority of

whom are appointed by officers of the government. The government cannot evade its most solemn constitutional obligations by resorting to a corporate form. *Id.* at ——————, 115 S.Ct. at 973–74.

■ Even if we assume that *Lebron* can be read to extend Amtrak's constitutional obligations to an extent similar to executive agencies of the federal government, it does not follow that the Amtrak competitive bidding and selection process creates an entitlement for Hill having constitutional dimension. First, the sort of property interest giving rise to due process protection is one for which plaintiff has "a legitimate claim of entitlement," which must be "more than a unilateral expectation." *Board of Regents v. Roth,* 408 U.S. 564, 569–72, 92 S.Ct. 2701, 2705–07, 33 L.Ed.2d 548 (1972). Here, Hill has no contract with Amtrak, and, even if it did, the Third Circuit has emphatically hesitated "to extend the doctrine ... to constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." *Reich v. Beharry,* 883 F.2d 239, 242 n. 2 (3d Cir.1989), quoting *S & D Maintenance Co. v. Goldin,* 844 F.2d 962, 966–67 (2d Cir.1988).[3]

■ Even if Hill had been the top bidder and had negotiated the construction management contract, which never occurred, an agency's decision to rebid a contract after the agency learns of improper decisionmaking does not implicate any liberty interest, since the plaintiff is not precluded from other contracts nor is the contractor's good name besmirched. *United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 34 (6th Cir.1992). Such a liberty interest may arise in an agency's procurement process if a company is barred or eliminated from it because of charges of fraud or dishonesty without opportunity for a hearing. *Smith & Wesson v. United States,* 782 F.2d 1074, 1081 (1st Cir. 1986). Hill does not claim such a situation exists here, since neither Amtrak nor New Jersey Transit alleges that Hill has engaged in dishonesty.

■■ In the present case, for purposes of argument, we may assume that plaintiff Hill has a weakly protectable interest in the status conferred upon the top-ranked bidder by the Amtrak procurement process which must be afforded due process before its negotiation rights can be terminated. When the constitution affords a limited due process protection to one having a cognizable interest that is affected by governmental action, the law recognizes the right to have relevant facts considered by the administrative decision makers before adverse governmental action displaces the party's interest. The government is required to act in a rational manner in such a situation, and it may not invade a liberty or property interest in an arbitrary and capricious manner. This is not to say, however, that some amorphous body of constitutional law fills the vacuum caused by the lack of federal statutes and regulations governing Amtrak's Project Manager selection process. No precedents prescribe precisely what process is due when Amtrak decides, as in the present case, to conduct a re-evaluation that displaces its top-ranked bidder before actual negotiations have commenced. Because Hill was never selected as the contract recipient, however, this is not a case where its actual selection has been displaced by administrative action, nor has it been disqualified from consideration for Amtrak and NJ Transit contracts. In fact, Hill continues to perform upon at least one contract with NJ Transit. This means, obviously, that the due process clause affords no protection to Hill, because Hill did not acquire a special property or liberty interest by virtue of seeking to become an Amtrak contractor. But even if we were to assume that Amtrak were a federal agency performing a governmental function for purposes of due process protection, and even if we assumed that one who enters into an

---

**3.** Two exceptions to this rule, not pertinent to this case, would find a contract right giving rise to a "property interest" protected by due process, namely, rights characterized by extreme dependence or permanence (welfare rights, tenure, or Social Security benefits, for example) or where the contract itself confers an expectation that the government can terminate the contract only for cause. *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1399 (3d Cir. 1991), citing *S & D Maintenance,* 844 F.2d at 967.

Amtrak procurement process acquires some sort of protectable liberty or property interest in due process (contrary to the above-cited precedents), it is clear in this case that the procedures used by Amtrak in these decision making processes afforded due process to Hill.

The essence of procedural due process is the right to be heard, *Mathews v. Eldridge,* 424 U.S. 319, 321, 96 S.Ct. 893, 896, 47 L.Ed.2d 18 (1976). Similarly, the essence of substantive due process is the right to governmental action which is not "arbitrary or irrational." *DeBlasio v. Zoning Board of Adjustment,* 53 F.3d 592, 593 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995).

We assume that Amtrak's selection process made the promise to all bidders, including Hill, that a certain evaluation scheme would be used to determine the top-ranked bidder, and that negotiations for the contract would then be commenced only with the top-ranked bidder and, if negotiations fail, then the next highest ranked bidder. We may also assume that Hill, originally ranked at the top with one other competitor among the ten eligible bidders, had an interest in decision making that was not irrational or clearly illegal.

 This standard emerges from the analogous jurisprudence involving suits for injunctive relief by disappointed federal procurement bidders, especially *Princeton Combustion Research Laboratories, Inc. v. McCarthy,* 674 F.2d 1016 (3d Cir.1982); *Coco*

*Brothers, Inc. v. Pierce,* 741 F.2d 675 (3d Cir.1984); *Sea–Land Service, Inc. v. Brown,* 600 F.2d 429 (3d Cir.1979); and *Allis–Chalmers Corp. v. Friedkin,* 635 F.2d 248 (3d Cir.1980). In each case, a disappointed bidder sought injunctive relief against federal agency decisions awarding procurement contracts to others, and in each case the agency's decision was upheld in the Third Circuit because it was found not to be irrational or clearly illegal. *See, e.g., Princeton Combustion Research Laboratories, supra,* 674 F.2d at 1019. The aggrieved bidder has the burden of demonstrating "that there was no rational basis for the agency's decision," *Sea–Land Service* at 434, quoted in *Princeton Combustion* at 1021.[4]

Against this background, the facts of this case demonstrate that Amtrak extended to Hill all the process that was due, and that Amtrak's decision to exclude Hill from further consideration was not irrational, for the reasons now explained. The evidence shows Amtrak, aided by NJ Transit, engaged in a careful and deliberate process to select the Project Manager. It commenced in or around May 1995, when Amtrak solicited Requests for Proposals ("RFP") for a Construction Manager in connection with an anticipated project involving the demolition and construction to be performed on the East End Passenger Concourse at Penn Station, New York, New York ("Concourse Project"). This Contract ("Contract") was estimated by Amtrak to range between $2 and $5 million and was expected to have a term of approximately five years.

---

4. When this issue arises in a preliminary injunction context, as in the present case, the Third Circuit has made it clear that "the district court's review of an agency's procurement decision is extremely limited in scope. The district court is not to substitute its judgment for the agency's, but may only act when an agency's decision is found to be irrational." *Princeton Combustion* at 1021. Further, even if the district court finds the agency's procurement decision to be irrational, the court has discretion to decide whether to grant or deny the injunction, considering a balancing of three factors, namely "the practical considerations of efficient procurement of supplies for continuing government operations; the public interest in avoiding excessive costs; and the bidder's entitlement to fair treatment through adherence to statutes and regulations." *Sea–Land Service* at 434, quoted in *Princeton Combus-*

*tion* at 1022. These three *Sea–Land* factors are overlaid upon the normal preliminary injunction considerations described above, enhancing the burden on plaintiff in the procurement setting and cautioning extreme judicial reluctance to enjoin procurement decisions absent manifest necessity to prevent fraud, illegality or gross abuse of discretion.

Third Circuit law is also clear that in the procurement preliminary injunction context, irregularities in the procedures not amounting to fraud or corruption are not to receive consideration unless the result is to render the agency decision irrational. *Princeton Combustion* at 1022. The court's scope of review is essentially limited to the decision itself, and not to the bumps or irregularities in the procedural path leading to the decision.

By a letter dated May 10, 1995, Amtrak invited Hill to participate in the RFP process by submitting a Qualification Statement. As part of Amtrak's solicitation, Hill was directed to complete Form 255, "Architect–Engineer and Related Services Questionnaire for Specific Projects," and to submit same no later than May 22, 1995, to ensure that Hill would be eligible to be added to Amtrak's prospective bidder's list.

Hill responded to Amtrak's solicitation by timely submitting all required documentation. On October 5, 1995, Amtrak held a pre-proposal meeting, which representatives of Hill attended. On or about October 20, 1995, in accordance with Amtrak's instructions, Hill submitted its proposal for the Concourse Project ("Hill Proposal.") On February 2, 1996, Hill submitted an amendment to its proposal.

The Hill Proposal consisted of three volumes: a technical proposal, a price proposal, and a revised cost proposal, for a total proposal price of an amount higher than most of the competitors.

On or about February 8, 1996, Paul R. Mancini, Contracts Manager for Amtrak, informed Thomas J. Spearing, III, a Vice President of Hill, by letter, that Hill "ha[d] achieved the requisite total points required to proceed with the next phase of the selection and award process." (*See* Paul R. Mancini's letter dated February 8, 1996, submitted herewith as Exhibit "A.")

We know that Hill was not the top-ranked bidder after the evaluations of its proposal, but that it received enough points to be among the top four and to proceed to the oral presentations phase, to be held on February 22, 1996. Amtrak's evaluation of the proposals of the first round comparing the 10 bidders appears in the record at A–00161 (under seal). Hill's bid package was well received even though its proposed price was among the highest of the 10 eligible bidders. (*Id.*) The evaluation criteria were attached to the Declaration of John DeVito dated August 21, 1996 at Ex. A.

The February 8, 1996, correspondence set forth the process by which Defendants were to award the Contract; to wit, the Selection Committee was to receive formal presentations from each bidder deemed qualified, rate each bidder by awarding points for various categories, and begin a negotiation process with the bidder receiving the highest point total.

Hill's formal presentation was also well-received, with Hill receiving the highest score, surpassing the next competitor by a very slender margin. Hill's total score was tied for first place, but Amtrak advised Hill it was the selectee for continued negotiations, to commence about April 25th.

On April 25, 1996, Tom Spearing and Michael Griffin of Hill met with Paul Mancini and Bob Ferrigno of Amtrak and Saundra Lautenberg of NJT at NJT's headquarters in Newark, New Jersey to commence negotiations.

At about that time, however, Amtrak learned of certain financial issues that had been raised about Hill's solvency in litigation launched in late 1995 by its major creditor, seeking immediate accelerated payment of a loan of $6.1 million. The litigation is encaptioned *First Fidelity Bank, N.A. v. Hill International, Inc., et al.*, Docket No. BUR–L–03400–95, which is still pending in the Law Division of the New Jersey Superior Court, Burlington County. The Bank alleged that an event of default had occurred when Hill sold off a large asset that had served as part of the collateral for these loans, and the Bank further alleged that Hill fraudulently concealed the transaction from the Bank. Hill denies these allegations and has filed a counterclaim against the Bank for interference with Hill's relationship with Hill's own customers. Expert opinions were exchanged in that case, with the Bank's financial expert opining that Hill was insolvent and unable to satisfy the loan repayment when regarded as a current obligation, and Hill's expert opining that the obligation is a long-term debt which does not impair Hill's solvency.

Amtrak requested certified financial statements for Hill's last three years, 1993, 1994 and 1995. Hill produced its certified statements for 1993 and 1994, but did not produce one for 1995 because the Bank litigation had impaired its preparation. The Superior Court Judge has issued an interlocutory or-

der restraining any efforts by the Bank to execute upon the entire loan, and whether Hill owes the entire accelerated debt remains to be determined at trial in Superior Court sometime after mid–1997. Settlement efforts between Hill and the Bank had been unsuccessful until about November 8, 1996, when Hill's attorneys in the Superior Court litigation wrote a letter to the bank's attorneys confirming an alleged agreement in principle to settle the litigation, subject to contingencies, discussed below.

In any event, Amtrak's examination of Hill's financial statements yielded troubling information, including the notation in the report for 1993 that Hill would owe a balloon payment of $6.1 million on June 1, 1996. Amtrak checked with Hill and learned that the balloon payment had not been made and that Hill was continuing negotiations with its creditors. Also, Hill's financial statements showed that net losses increased while working capital decreased between 1993 and 1994. Also, a competitor of Hill, namely Bechtel, told Amtrak that Bechtel had been required to pay some of Hill's bills on another project. (Ferrigno Decl. ¶ 8). Finally, Hill's unaudited statement for 1995 showed an operating loss of $1,575,335. (Id.¶ 11).

After Hill's questionable financial circumstance came to light, Amtrak informed Hill that Amtrak's Robert Ferrigno had taken over the concourse project from Paul Mancini on June 13, 1996. Ferrigno reviewed the file of the selection procedures, giving special attention to the financial stability ratings that had been given. His review disclosed that Amtrak's John Devito had graded the bidders in the category of financial stability capability, and that Devito had assigned a top score of 35 points to all ten proposals. (See Devito Cert. 8/21/96 at ¶ 4–6.)

Mr. Ferrigno determined that Mr. Devito had made a mistake in these ratings of financial stability/capability, and that those scores must be recalculated. Mr. Ferrigno grew concerned about Hill's financial ability to manage a 5–year, $60 million project. (Id. ¶ 15.) His methodology for the recalculation of this item was set forth in his contempora-

neous memorandum dated July 10, 1996 (Ex. A–00140–143), which was concurred in by Mr. Mancini and by Program Director James Powers, III, as indicated by their signatures. (Ex. A–00143.) Using the Dun and Bradstreet credit reports of each of the top four contenders, and awarding a sliding scale of points based on the ratings, two firms (including Hill) were downgraded to 15 points out of 35, while two with high ratings received the full 35 points. Hill's score was then substantially less than the other three finalists, and Hill was dropped from further consideration. Mr. Ferrigno sent Hill a letter on July 11, 1996 (Ex. A–0002), advising that Hill's score had been modified to correct a mistake in the scoring, and that Hill was no longer among the parties eligible to negotiate this contract. Mr. Ferrigno set forth his thought processes at length, both in the internal memorandum of July 10, 1996, supra, and in the sworn certification filed herein dated August 13, 1996, which are consistent with one another.

Mr. Ferrigno's letter to Hill, dated July 11, 1996, supra, contains a different explanation for the change which appears to be partly true and partly untrue. This letter correctly describes the re-scoring within the general category of "evaluation criteria for proposed pricing," but it incorrectly assured Hill that the rescoring "was not precipitated by Hill's financial condition or any related correspondence." (Ex. A–0002).

There is also evidence that Mr. Ferrigno reached the decision to exclude Hill at an earlier date, June 25, 1996, after he had analyzed Hill's financial picture but before preparing the July 10th memo to file explaining the recalculations. In a handwritten file memo (Ex. A–00018), Mr. Ferrigno traces the steps he took to investigate Hill's financial stability from June 1–15, 1996, followed by discussions with Ms. Lautenberg of New Jersey Transit, and finally a decision on June 26, 1996 to disqualify Hill based on "their price and financial ability." (Id.) Curiously, this note added: "All agreed, but NJT [New Jersey Transit] refused to confirm or concur in writing." (Id.) [5]

---

5. This last line was illegible on the court's copy but was deciphered by Amtrak's counsel on the record at the preliminary injunction hearing.

The Amtrak decision—that Hill lacked sufficient financial stability to perform the five-year contract with reasonable assurance—emerges clearly on the record, even if there are disputes about precisely when it was made or how it was arrived at. This court's focus in this case, by analogy to the disappointed bidder cases above, is on the rationality of the decision, not the precise procedure by which it was reached.

It is clear that the decision was well within the bounds of the due process owed by Amtrak to a top ranked bidder. Amtrak correctly concluded a mistake of scoring had been made, and it used a reasonable yardstick (the Dun & Bradstreet reports on each of the top four competitors) to recalculate the scores. Hill's less favorable Dun & Bradstreet rating was a reflection of several reported factors, including a tendency to pay bills late and the absence of the most recent certified financial report. This was a fair summary of the financial crunch that Hill was in fact experiencing, due to the accumulated annual operating losses of recent years, the litigation with its largest creditor, the uncertainty of when and whether an extremely large corporate obligation would be payable, and the information supplied by Bechtel that it had to make good on some of Hill's expenses on a project, none of which was known to Amtrak when it first scored Hall's financial stability, and all of which were known to Amtrak by the time it did the re-scoring.

Amtrak's use of Dun & Bradstreet was rational, since the reports containing detailed commercial credit information are routinely relied on by parties considering long term financial relationships.

Amtrak's concern with long-term implications of Hill's situation is also rational, since Amtrak wants a successful project and not one that is interrupted by the financial distractions of its Project Manager, even if Hill is fully bondable.

Amtrak's timing was not arbitrary, whether the decision was reached on June 25 or July 10, since either date was at least two months after Amtrak first told Hill it had questions about financial status, giving Hill ample opportunity to provide information and explanations. Amtrak's rejection of those assurances and explanations from Hill was not irrational; for example, Hill's prediction in June that the Bank case would be settled in a month's time has not turned out to be correct.

Amtrak's use of the D&B rating of a parent of one of the competitors in the re-scoring process was not irrational, because the competitor had a long-standing excellent credit history itself and because its acquisition by the parent within the past year was an acquisition of substantially all assets *and liabilities,* according to the D&B report, which undoubtedly would result in assurances that the parent stands behind this obligation of the competitor.

It may be unfortunate that Hill International's main creditor has chosen this moment to call its loan and to allegedly disparage Hill's credit-worthiness, but Amtrak is reasonable in its concern about the implications of the Bank's lawsuit, as well as Hill's operating losses that pre-existed the Bank litigation.

If the foregoing constituted all the consideration and reasoning employed by Amtrak in its redetermination of Hill's suitability to become Project Manager, the decision would pass muster. Amtrak went even further, however, when it agreed to a further consideration of Hill's financial status, after the first preliminary injunction hearing. By letter of agreement dated September 4, 1996, Amtrak agreed to receive and review further specified financial information from Hill, and to meet not later than September 27, 1996 at Amtrak's offices for a supplemental oral presentation on Hill's financial status, and to decide within 7 days thereafter (later extended to 14 days) whether Hill is eligible to participate in further negotiations. Further, Amtrak agreed that if it continued to find Hill was ineligible, it would set forth its reasons in writing and Hill could then renew its preliminary injunction motion. This court, by Order of September 6, 1996, dis-

missed the preliminary injunction motion without prejudice to reinstatement.

Hill submitted financial and other information to Amtrak which Hill believed establishes Hill's financial responsibility, and Hill attended the meeting on September 26th. (See letter of Steven Weinstein, Oct. 12, 1996.)[6] At Amtrak's request at the meeting, Hill provided supplemental cash flow information reflecting two possible scenarios: one in which the litigation with the bank was resolved, and one in which it was not.[7]

Amtrak's Powers took a "fresh look" at the whole question of the degree of Hill's financial responsibility. (Powers Decl., Nov. 5, 1996 at ¶ 4.) Powers conducted a review of "all financial information relating to Hill within Amtrak's possession, including information provided by Hill prior to this suit, information received by Amtrak at the September 27, 1996 meeting, documents forwarded by Hill on October 4, 1996, as well as information from Dun & Bradstreet and from the action pending in Burlington County, New Jersey." *Id.* ¶ 5.

Amtrak's decision determining that Hill was not a responsible bidder was issued in Mr. Powers' letter of October 10, 1996, which recites in six pages of detail the reasons for Amtrak's decision to not enter into contractual negotiations with Hill. The October 10th decision reflects Amtrak's determination that Hill "does not currently meet the standards necessary to be considered by Amtrak as a responsible prospective contractor, with respect to the [Amtrak Solicitation for Construction Manager]." (Letter of Oct. 10 at 1.) This decision letter recited Amtrak's view of the various issues related to financial responsibility, such as Hill's lack of a Dun & Bradstreet Rating, and an audited financial statement for 1995 showing a worsening of the ratio of cash from operating activities over current liabilities, as well as the ratio of total liability over stockholders equity, compared with one year earlier. The Dun &

Bradstreet report, while unable to give Hill a business rating, lists Hill as having the highest level of financial stress rating, which would impact on a company's ability to obtain necessary financing, *see* Letter of Oct. 10 at 1. These reasons are logical and rational, in this court's view.

The decision letter was critical of Hill for not supplying an audited financial statement for 1996 through August, since Amtrak could not rely for these purposes upon unaudited internal statements. Although Hill argues that it is unfair that Amtrak would not place much stock in the 1996 unaudited statements, it is neither irrational nor unfair for Amtrak to observe that while an audited statement of the current year to date is not necessary, Hill should have submitted at least a CPA's review of the unaudited statements as the customary approach for Hill to substantiate its financial position. (Letter of Oct. 10 at 2). Moreover, this subject was discussed at the September 27th meeting, and Mr. Richter responded that Hill "does not want to pay for an audit during the middle of the year." (*Id.* at 2.) Hill's own projected cash flow 'from operations' turns positive for year-end 1996, but the "overall" cash flow projected for the year is a loss exceeding a million dollars, which hardly bespeaks a healthy cash flow. Amtrak's position that it could not put much reliance upon Hill's internal financial statement is not irrational under all these circumstances, and the presently cloudy financial picture cannot fairly be debated by Hill.

Amtrak also was concerned that Hill's major banking relationship with First Union National Bank and United Jersey Bank and their predecessors, spanning 17 years and many millions of dollars in loans, was unstable. (Letter of Oct. 10 at 2.) Amtrak may have misunderstood the substance of a settlement offer of the bank litigation, however, as Amtrak mistakenly believed Hill had made an offer that Amtrak predicted the banks would find unacceptable when in fact it was

---

6. Hill's first supplemental submission was the "Supplemental Financial Documentation" dated September 13, 1996, containing Hill's audited 1995 financial statements, reproduced at Ex. A to Ford Decl. (Nov. 6, 1996).

7. Hill's second supplemental submission, in response to Amtrak's request at the meeting, was the letter of Irvin Richter, Chairman and CEO of Hill, to James Powers, III, of Amtrak, containing Hill's unaudited cash flow projections for 1996, reproduced at Ex. B to Ford Decl. (Nov. 6, 1996).

the banks' offer to Hill. Indeed, a month later, on November 8, 1996, a letter of intent respecting proposed settlement of the bank litigation was written by Hill's attorneys to confirm the outline of a settlement agreement roughly along the lines of the proposal that Amtrak had predicted would be rejected by the banks. (See Letter of Alan S. Fellheimer, Esq. to Donald M. Harrison, Esq; dated Nov. 8, 1996.) Although Amtrak's understanding regarding the status of settlement discussions of the bank litigation was not correct, the fact remains that no settlement has been reached, even when we enlarge the record to include events occurring after the October 10th decision. Normally, a court should examine the record of decision as it existed when the decision was made, *C.K. v. New Jersey Dep't of Health and Human Services*, 92 F.3d 171, 182 (3d Cir. 1996). When the aggrieved party asserts that an error of fact has been made within an aspect of the decision making rationale, the court must assess the materiality of that error, and use of subsequent information cannot be foreclosed. This subsequent information—developed on November 8th—indicates Hill's settlement with First Union National Bank and Summit Bank is more likely than Amtrak believed, but the fact remains that Hill has not achieved a settlement. Amtrak argues, correctly in this court's view, that it is not comforted by a "letter of intent" to settle, drafted by Hill's attorneys, containing numerous contingencies and subjects for further negotiations, in the context of the Superior Court litigation which has been rather nasty and acrimonious. The bank litigation continues to loom as a cloud over Hill's financial viability, although there is reason to hope that the clouds will be parting soon and Hill will enjoy sunnier days. Again, no reasonable fact finder could conclude that Amtrak should not be concerned that Hill remains under that litigation cloud with its major financial institutions, especially when compared with competitors in the contracting process which have a clear financial record free of such suits by major financial institutions. Moreover, the existence of the banking litigation was far from the only legitimate financial problem reflected in Hill's submissions over the past year, as discussed throughout Amtrak's decision letter.

As to several other minor points, Hill quarrels with Amtrak's interpretation of the financial data. For example, Hill argues Amtrak's October 10th letter incorrectly challenges an unaudited "loan to affiliate" entry, since Hill points out it was audited and found to be proper in past years; Amtrak was concerned, however, that this entry had grown by a million dollars in the first 8 months of 1996, to a total of $4 million, again weakening financial stability.

In conclusion, defendants' motions for summary judgment will be granted because Hill has come forward with no material facts that could lead a reasonable factfinder to conclude that it has received arbitrary, irrational, or biased treatment at the hands of these defendants.

## IV. Conclusion

In summary, Amtrak has given careful, prolonged consideration to Hill's financial picture as it emerged during 1996. Hill's income and assets have shrunk while annual losses have grown, causing cash flow problems and an unfavorable credit rating. Due to the bank litigation, this has been a tumultuous year for Hill. That claim by the banks has hung over Hill's future like the sword of Damocles, as Hill acknowledges and as Amtrak repeatedly fears. Amtrak's responses to this unresolved litigation brought by Hill's main lenders have been entirely rational and predictable. In the highly competitive field of construction management, Amtrak is free to deal with companies that are, like Hill, well established and experienced throughout the world in major construction projects, but which, unlike Hill, have clear financial ledgers unclouded by banking litigation and threats of illiquidity. Since Hill was a frontrunner for this contract until the bank litigation became known, Hill's loss of this contract opportunity was not caused by any lack of rational and fair decisionmaking by Amtrak but by crippling litigation that, if unwarranted in fact or law, has done an injustice as to which Hill is not without a remedy. Such a remedy does not lie against Amtrak or New Jersey Transit, however, for reasons already discussed.

Because Hill has no prospect of success upon the merits, its motion for preliminary injunctive relief must be denied. Because this court finds that no material issues of fact are in dispute, and that Amtrak and New Jersey Transit are entitled to judgment as a matter of law, the accompanying Order granting defendants' motions for summary judgment is entered.