**C & C/MANHATTAN, a joint venture, Plaintiff**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS and HEERY
INTERNATIONAL, INC., Defendants
HYDE PARK/PERINI, Intervenor**

Civ. No. 876/1998

Territorial Court of the Virgin Islands

Div. of Saint Croix at Kingshill

February 12, 1999

51

Lee Rohn, Esq., (Rohn & Cusick), Christiansted, U.S.V.I., *for Plaintiff*

Solicitor General Paul Gimenez, Department of Justice, St. Thomas, U.S.V.I., *for Government*

Matthew J. Duensing, Esq. and Garry E. Garten, Esq., (Jones, Stryker, Duensing, Casner & Dollison), St. Thomas, U.S.V.I., *for Heery International, Inc.*

W. John Amerling, Esq., (Sanford, Amerling & Associates), St. Thomas, U.S.V.I., *for Hyde Park/Perini*

CABRET, *Judge*

## MEMORANDUM OPINION

C & C/Manhattan ("C & C") is a joint venture competing for the award of contracts requiring the design and construction of three Government of the Virgin Islands facilities. After the Government rejected C & C's proposals for each of the projects, C & C sued the Government and Heery International, Inc. ("Heery"), a company retained by the Government to manage its construction program. In its complaint, C & C alleges that the Government and Heery violated numerous laws governing the contract procurement process, which resulted in all three contracts being awarded to its competitor, Hyde Park/Perini ("Hyde Park"). Pending before the Court is C & C's motion for a preliminary injunction in which it requests that the Court enjoin the Government and Hyde Park from proceeding with further action on one of the contracts.[1] For reasons which follow, C & C's motion is granted.

## I. THE FACTS

The relevant evidence shows that in anticipation of building numerous government facilities, the Government hired Heery, a

---

[1] Although C & C originally moved for injunctive relief against both defendants on all three projects, it withdrew its motion against Heery, and at the hearing on this matter the parties represented to the Court that the Government has voluntarily ceased taking further action on two of the contracts.

company specializing in all phases of design and construction management, to prepare requests for proposals, assist in the evaluation of the proposals and manage, on behalf of the Government, the ultimate design and construction of the facilities. Included in the Government's building program is the construction of an addition to the Golden Grove Prison and a new jail on St. Croix ("prison project"). The process used by the Government to procure a contract for the design and construction of the prison project is at issue here.

The process started with the execution of a Memorandum of Understanding between the Government's Department of Property and Procurement ("P & P") and the Public Finance Authority ("PFA"). P & P is responsible for purchasing or contracting for supplies, materials, equipment and services on behalf of most governmental agencies. *See* V.I. Code Ann. tit. 31 § 232 (1)(1998). The PFA was created to aid the Government in the performance of its fiscal duties including the raising of capital for essential public projects. *See* V.I. Code Ann. tit. 29 § 918 (1998). The Memorandum of Understanding between these two agencies reflects that the Government has been under court order since December of 1986[2] to "eliminate the overcrowding of our correctional facilities and to upgrade the conditions of confinement presently existing."[3] In an effort to timely remedy these problems, P & P and the PFA agreed on an expedited process to procure a single contractor to design and construct additional facilities.

As described in the Memorandum of Understanding, the process would begin with the Commissioner of P & P appointing a "Prison/Jail Projects Committee" ("Selection Committee") which would consist of the Commissioner of P & P, the Attorney General, the Director of the Bureau of Corrections, the Commissioner of Public Works, the Commissioner of Planning and Natural Resources, the Director of the Public Finance Authority and the

---

[2] *See United States v. Gov't of the Virgin Islands,* Civ. No. 86-265 (D.V.I. 1986) Consent Decree entered December 1, 1986.

[3] Def. Hyde Park's Ex. 2, Mem. of Understanding at 1. Testimony showed that although the existing prison is designed to house only 124 inmates, 258 inmates are currently incarcerated there. In addition, the Government is currently housing approximately 200 inmates in stateside facilities.

Special Assistant to the Governor for Capital Projects. The Selection Committee would be responsible for determining which firms were qualified to design and construct the proposed facilities, and after meeting with these firms and evaluating their proposals, select the most qualified firm and negotiate a contract with that firm.

A preliminary qualification procedure commenced with the Government advertising a request for qualifications. After reviewing the qualifications of responding firms, the Selection Committee found three firms qualified to submit proposals for the design and construction of the prison project: Plaintiff C & C, Defendant Hyde Park, and a third firm, Custom Builders/Hensel Phelps ("Custom Builders"). These qualified proposers needed some guidance to enable them to submit proposals which would meet the Government's needs. This guidance was provided by a request for proposal ("RFP") drafted by Heery's program manager, Mr. Joseph Sanches ("Sanches"), and issued to the qualified proposers by the PFA. The RFP was approximately 70 pages long and described such particulars as design and construction criteria, contractor responsibilities, the Selection Committee's evaluation process and the evaluation standards.

After completing his initial draft of the RFP, Sanches discussed its contents with various Selection Committee members and revised it to reflect the comments and suggestions he received. Specifically, correspondence in evidence indicates that on August 26, 1998, Sanches sent the RFP to the Bureau of Corrections for review and comment. In another letter from Sanches to the Attorney General, dated September 11, 1998, Sanches enclosed the RFP and requested that he be notified of any changes. After completing the final draft of the RFP, Sanches sent it to the PFA for final review and distribution. Although the Commissioner of P & P was sent copies of all this correspondence, Sanches acknowledged that he never actually discussed or reviewed the RFP with the Commissioner of P & P and did not even know P & P was responsible for procuring the contract. In fact, Sanches testified that it was his understanding that the PFA was authorized to issue the RFP on its own.

The finalized document, dated September 17, 1998, is titled "REQUEST FOR PROPOSAL TO DESIGN AND BUILD THE

GOLDEN GROVE PRISON ADDITION & NEW JAIL."[4] According to the terms of the RFP, it was issued "by the Government of the Virgin Islands ... to qualified offerors to design and construct a prison facility addition and a new jail facility. . . ."[5] The RFP contains information regarding technical requirements, the proposal submittal and evaluation process, evaluation criteria and the scope of work which will be required by the selected proposer, referred to in the RFP as the "Design/Builder."[6] The section governing the Design/Builder's general responsibilities shows that the scope of services includes "[m]anagement and execution of [the] Design Phase" and "[m]anagement and execution of the Construction Phase."[7] The Design/Builder's construction responsibilities are outlined in greater detail later in the RFP, where it specifies 16 construction related services the design/builder will be required to perform. Included in these 16 services is the actual "[c]onstruction of the Project."[8] Sanches characterized the RFP as requiring design, construction management and actual construction services.

As planned, the PFA issued the RFP to the three previously qualified proposers. In order to ensure that the qualified proposers fully understood the requirements of the RFP, the document required them to attend a Pre-Proposal Conference at the Office of the Attorney General and a site visit at the Golden Grove prison facility. In addition, the RFP provided that any questions concerning the RFP or requests for additional information should be presented to the designated contact person, Mr. Amadeo Francis ("Francis"), the PFA's Director of Finance and Administration and chairman of the Selection Committee. Answers to these questions were provided to the proposers in an addendum to the RFP issued by the PFA on October 5, 1998. The addendum also contained amendments to the RFP and a revised selection schedule.

The revised selection schedule required the proposals to be submitted to the PFA by October 22, 1998. It appears that all three

[4] Def. Hyde Park's Ex. 1, 9/17/98 RFP at cover page.

[5] *Id.* at 1.

[6] *See id.* at 13.

[7] *Id.*

[8] *Id.* at 14.

55

firms timely complied with this deadline and shortly thereafter made scheduled oral presentations to the Selection Committee. The proposals and presentations were subsequently evaluated by Sanches and another Heery employee, Mr. David Kimmel ("Kimmel"). Sanches and Kimmel summarized their evaluations in a November 4, 1998 memo to Francis.

Heery's memo contains narrative and spreadsheet assessments, comparisons and rankings of the proposals based on various evaluation criteria. Specifically, Sanches and Kimmel evaluated each of the proposals for compliance with an architectural program contained in the RFP, creativity, staffing of key positions on the design and construction teams, completion schedule, pricing, site logistics and construction approach, design approach, project understanding, previous experience working as a team and proposal presentation. Heery rated all three firms equally in one category (completion schedule), C & C first in one category (previous experience), Custom Builders first in one category (design approach) and Hyde Park first in the remaining seven categories. Heery concluded that "[b]ased on the criteria established by the Committee, we recommend that the team of Hyde Park/Perini be selected as the firm that the [C]ommittee enters into negotiations with for this project."[9]

On November 5, 1998, the Selection Committee met to vote on the proposer with which it would enter into contract negotiations. Although all seven Selection Committee members were notified of the meeting, the Commissioner of P & P did not attend. The six remaining Selection Committee members voted unanimously to select Hyde Park as the firm with which the Committee would negotiate a contract. The Selection Committee also ranked the other two proposals and decided, based on a contract negotiation procedure detailed in the RFP, that if it was unable to successfully negotiate a contract with Hyde Park, it would enter negotiations with the second ranked proposer, Custom Builders. Similarly, if the Selection Committee was then unable to negotiate a contract with Custom Builders, it would negotiate with C & C, which it ranked third among the proposers. Committee Chairman Francis notified

[9] Pl.'s Ex. 7, 11/4/98 Memo from Heery to Francis at 7.

C & C of the decision in a letter dated November 5, 1998. In the letter, Francis stated: "After careful evaluation of the proposals and presentations for the contract to Design and Build the Golden Grove Prison Addition and New Jail, the Prison/Jail Projects Committee has decided to enter into contract negotiations with the team of Hyde Park/Perini."[10]

After receiving notice of its rejection, C & C filed a written protest of the decision with the Acting Commissioner of P & P, Mr. Samuel Baptiste ("Baptiste"). In the protest, dated November 9, 1998, C & C alleged that the decision to award the contract to Hyde Park was 'improperly made in violation of the regulations and statutes of the U. S. Virgin Islands. C & C/Manhattan was the lowest responsive bid proposer and as such should have received the award."[11] C & C further alleged that Heery's evaluation of its proposal erroneously found it was not in compliance with several of the RFP requirements and that Heery considered evaluation criteria that were not conveyed to all the proposers.

Baptiste testified that when he received the protest, he forwarded it to the Department of Justice ("DOJ") because he was informed that DOJ's attorneys would handle the matter. When a decision rejecting the protest was eventually issued on December 3, 1998, however, it was on P & P letterhead and signed by Baptiste. Baptiste explained that although he did not prepare the decision, he authorized it. Addressing the merits of C & C's protest, the decision states that the firm erroneously applied the "lowest, responsive bidder" standard required in competitive bidding in asserting that it should have been awarded the contract.[12] The decision elaborates the Government's position that the standard cited by C & C applies only to competitive bidding which is inapplicable to the RFP and negotiation process used by the Government in this case. In response to C & C's remaining allegations, the decision rejects the plaintiff's claims of political favoritism, and states that "[o]ur review reveals no instance of

---

[10] Pl.'s Ex. 6, 11/5/98 Ltr. from Francis to C & C.

[11] Pl.'s Ex. 8, Notice of Protest of Prison Bid Proposal at 1.

[12] Pl.'s Ex. 9, Protest Decision dated 12/3/98 at 2.

improper actions in the selection process, which supports your claimed irregularity."[13]

Shortly after rejecting C & C's protest, the Government began negotiating a contract with Hyde Park for the design and construction of the prison facility. The team of negotiators representing the Government consisted of four members of the Selection Committee and Heery as an advisor. The four Selection Committee members who served as negotiators were the Commissioner of Public Works, the Attorney General, the Director of the Bureau of Corrections and the Special Assistant to the Governor for Capital Projects ("Negotiation Committee"). Over the next two weeks, the Negotiation Committee met with Hyde Park in an attempt to arrive at a contract that would meet the Government's needs with the funds available for the prison project. Because the cost of the project as defined in the RFP and proposed by all three proposers exceeded a $25,000,000 funding cap, most of the negotiations were directed at cost-saving measures. These cost-saving measures primarily consisted of reducing the size and capacity of the facilities from those described in the RFP. After several meetings, the Negotiation Committee and Hyde Park settled on mutually agreeable terms for the design and construction of facilities that the Government could afford.

The resulting contract, which like the RFP was drafted by Heery, is a massive compilation of numerous documents. Although a detailed description is neither necessary nor possible in this opinion, certain provisions merit discussion. Specifically, the contract provides that it is an agreement between the Owner, which is defined as "The Government of the United States Virgin Islands acting by its Department of Justice, Bureau of Corrections" and the "Design/Builder," Hyde Park.[14] The project is summarily described as the "Design and Construction of the Golden Grove Prison Addition and New Jail."[15] The contract, like the RFP, requires Hyde Park to not only design facilities in accordance with the agreement, but also to construct those facilities. In fact, Sanches

---

[13] Id.

[14] Def. Hyde Park's Ex. 3, Agreement between Owner and Design Builder at 1.

[15] Id.

testified that approximately 70% of the contract was for construction related activities. In this regard, the contract makes Hyde Park "responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under this Agreement."[16] The contract is executed by representatives of Hyde Park, the Attorney General, the Acting Commissioner of P & P, the PFA's Director of Finance and Administration and approved by former Governor Roy L. Schneider.

Acting Commissioner of P & P, Samuel Baptiste, testified that although he signed the contract, he had only a very general knowledge of the services it required. Baptiste stated that he briefly attended three negotiation meetings, but had to leave early for various reasons and that he thus does not know what transpired. Indeed, it is clear from the evidence above that Acting Commissioner Baptiste played virtually no role in procuring the contract, and he candidly acknowledged that his limited role was the result of the prison project being turned over to DOJ. Baptiste further testified that P & P did not even maintain a file for the prison project and that although he requested a copy of the DOJ's file, he never received it. The three original executed copies of the contract are currently maintained by the PFA, DOJ and Hyde Park.

## II. THE ISSUES

Notwithstanding the numerous contentions raised by the parties throughout these proceedings, the Court finds that the relevant evidence merits consideration of only three basic issues:

1. Whether the contract at issue is for professional services such that the Government was authorized to procure it by negotiation;

2. Whether an agency other than P & P was authorized to procure the contract on behalf of the Government; and

3. Whether any improprieties that may have occurred require the grant of a preliminary injunction.

---

[16] *Id.* at 9.

## III. DISCUSSION

### A. The Procurement Process

In the Virgin Islands, the procurement of contracts for services required by most governmental departments and agencies is regulated by Chapter 23 of Title 31 of the Virgin Islands Code and the Rules promulgated pursuant to those Code sections. *See V.I. Code Ann. tit.* 31 "232 (1), 235, 245 (1998); V.I.R. & Regs. tit. 31, § 235-1 et seq. (1974) (the "Rules"). This authority establishes contract procurement procedures that vary depending on the nature of the services required. In most instances, the Code requires that service contracts be procured by a competitive bidding process. *See V.I. Code Ann. tit.* 31 §§ 235, 236 (1998). Under certain exceptions, however, the Code permits service contracts to be procured through a negotiation process. *See V.I. Code Ann. tit.* 31 § 239 (a) (1998); V.I. R. & Regs. tit. 31, § 239-1 (1974). The two procedures differ significantly, and contracts executed in violation of the applicable requirements are void. *See V.I. Code Ann. tit.* 31 § 249 (a) (1998); *see also Gen. Eng'g Corp. v. V.I. Water and Power Auth.*, 636 F.Supp. 22, 40 (D.V.I. 1985); *aff'd*, 805 F.2d 88 (3rd Cir. 1986).

■ As a general rule, the Government is required to competitively bid construction contracts. *See V.I. R. & Regs. tit.* 31, § 235-21 (1974). When the project involves the construction of public works, the Rules impose specific requirements for competitively bidding the contract. *See generally V.I. R. & Regs. tit.* 31, §§ 242-11 — 242-37 (1974) (providing competitive bidding requirements specifically applicable to public works construction projects). Under this competitive bidding scheme, the facility is designed and every detail of the project is specified before the Government advertises its invitation for bids. V.I. R. & Regs. tit. 31, §§ 242-1 (15), 242-11, 242-13, 242-30 (1974). Bidders then prepare bid proposals based on these plans and specifications. *See V.I. R. & Regs. tit.* 31, § 242-13 (1974). Bidders submit their bid proposals on standardized forms provided by P & P. V.I. R. & Regs. tit. 31, §§ 242-11, 242-14 (1974). The forms itemize every facet of the construction, and a bidder must specify a unit price for each item. V.I. R. & Regs. tit. 31, §§ 242-1 (5), 242-11 and 242-14 (1974). In addition to the schedule

of items, bidders must submit a proposal guarantee and information concerning its financial and organizational competency. V.I. R. & Regs. tit. 31, §§ 242-16, 242-21 (a) (1974). All bid proposals containing these materials are submitted to P & P in sealed envelopes. V.I. R. & Regs. tit. 31, § 242-17 (1974). The proposals are opened and read publicly at the time and place specified in the advertisement for bid proposals. V.I. R. & Regs. tit. 31, § 242-19 (1974). A board of awards, appointed by the Commissioner of P & P reviews each proposal and awards the contract, subject to the Commissioner's approval, to the "lowest responsive bidder." V.I. R. & Regs. tit. 31, § 242-24 (1974). It is clear and uncontroverted that the Government did not follow this process in awarding the prison project contract to Hyde Park.

■ Rather, the Government relied on an exception to the competitive bidding requirement and procured the contract through a negotiation process. The exception cited by the Government provides that contracts for "professional services" may be made without observing the competitive bidding requirements, "provided that such services shall be procured by competitive negotiation, wherever practicable[.]" V.I. Code Ann. tit. 31 § 239 (a) (4) (1998).[17] The Government contends that its contract with Hyde Park, which in construction industry parlance is referred to as a "design/build" contract, is for professional services and therefore was properly procured through negotiation. Although "professional services" are not defined by the Virgin Islands Code, the Rules provide some guidance in construing the phrase. Under the Rules, the Government is authorized to negotiate a contract for professional services only when the services "are of a professional

---

[17] Although the Code also provides a "public exigency" exception to competitive bidding, and the defendants frequently raised and seemingly abandoned this exception during the hearing, but nevertheless addressed the issue during closing arguments, it is clear that this is not an "emergency" as that term has been defined by the courts, and that the Government did not comply with the prerequisites for using the exception. *See* V.I. Code Ann. tit. 31 § 239 (a) (2) (1998); V.I. R. & Regs. tit 31, § 239-6 (1974); *Gen'l Eng'g, 636 F.Supp. at 45-46 (defining emergency as "a sudden or unexpected necessity requiring speedy action" and holding that where the Water and Power Authority was "cognizant of the need for a new generating facility since 1984 it cannot fairly be said that [a] May 23[, 1985] contract was prompted by an unforeseen combination of circumstances.").* In the instant case, it is clear that the Government has known about the overcrowding since at least 1986 when the District Court entered the consent decree.

61

nature, or are to be performed under Government supervision and paid for on a time basis[.]" V.I. R. & Regs. tit. 31, § 239-8 (a) (2) (1974). As an example, Rule 239-8 provides that professional services "include (but are not limited to) those of an architectural or engineering nature as well as incidental services that members of these professions and those in their employ may logically or justifiably perform." *Id.* The selection criteria contained in Rule 239-8 are also instructive. These criteria include the firm's or individual's "professional qualification" and "registration." *Id.*

Though it is clear from this authority that the Government was authorized to negotiate a contract for the design component of the prison project RFP, it is less clear whether the Rules also authorized negotiation of the construction services. Defendants cite *General Engineering Corp. v. Virgin Island Water and Power Authority*, 636 F.Supp. 22 (D.V.I. 1985) in support of their contention that the Government was authorized to negotiate the entire "design/ build" contract. In *General Engineering*, the Virgin Islands Water and Power Authority ("WAPA") entered into a contract with a private firm which essentially shifted WAPA's responsibility to provide St. Croix's power needs to the firm. Because WAPA's existing facilities were rapidly deteriorating and it had neither the funds nor the credit to remedy the deficiencies, the contract provided that the private firm would finance, design, construct, and operate a power plant which would be located on WAPA's property, and thereafter sell the power to WAPA. The contract involved a "complex and intricate process" that required "meshing the equipment purchased and integrated into WAPA's existing plant, with financing obtained by the third party who would own the equipment." *Id.* at 26. Although WAPA had previously issued a request for proposals for the project, none of the proposers would agree to the financing terms desired by WAPA. The firm that was ultimately awarded the contract previously served as WAPA's consultant and only presented a proposal after the others were rejected. One of the disappointed proposers challenged the procurement process on the ground that the contract's construction components should have been procured by competitive bidding.

Like the authority at issue in this case, the statutory scheme establishing WAPA's procurement authority required competitive

bidding with certain exceptions. One of those exceptions was for contracts requiring "professional, financial . . . or other expert services." *Id.* at 41 (quoting V.I. Code Ann. tit. 30 § 116 (a) (3)). Liberally construing this exception to provide WAPA with flexibility in procuring a contract, the court in *General Engineering* concluded that it exempted all aspects of WAPA's contract from the competitive bidding requirement, including the construction component. In reaching this conclusion, the court surveyed other cases in which the contracts at issue required both exempt professional service components and non-exempt service or equipment purchase components. Specifically, the court relied on *Autotote Ltd. v. N.J. Sports and Exposition Authority*, 427 A.2d 55 (N.J. 1981) and *Waste Management, Inc. v. Wisconsin. Solid Waste Recycling Authority*, 267 N.W.2d 659, 663 (Wis. 1978).

In *Autotote*, the New Jersey Supreme Court held that a contract requiring the installation and maintenance of a totalisator system at a racetrack was exempt from competitive bidding because it fell within the professional service exemption of the applicable state statute. As described by the court, the totalisator system involved "a complex computer network designed to tabulate and categorize the bets made on every horse in each race. The system also determine[d] the payoff for each race, including the specialty wagers (exacta, daily double, ect.)" *Autotote*, 427 A.2d at 56, n.1 In characterizing the contract as one for professional services, the court reasoned that although the contract included an equipment purchase component, it was essentially a professional service contract due to "the inextricable integration of a sophisticated computer system and services of . . . a [highly] technical and scientific nature. . . ." Id. at 59. Similarly, in *Waste Management*, the Wisconsin Supreme Court held that a contract requiring the construction and operation of a recycling facility was exempt from competitive bidding because the components of the system were "so interrelated that the ultimate nature of the system must result from professional expertise and educated judgment" and because the responsible authority "wanted to be able to hold one entity accountable for the successful operation" of the facility. *Waste Management*, 267 N.W.2d at 664.

Analyzing these contracts, the court in *General Engineering* found that in each case "the crux of the project package was professional

services." *Gen. Eng'g Corp.*, 636 F.Supp. at 43. Specifically, the court found that because the contracts in both cases required the integration of "highly technical equipment" by the contractors, the crucial component of the contract was for professional services. *Id.* Likewise, the *General Engineering* court found that in its own case the construction component was exempt from competitive bidding because the contract was primarily a financial services contract which was undisputably exempt from bidding. *Id.* at 44.

In the instant case, the Court disagrees with the defendants' contention that General Engineering exempts the prison project design/build contract from competitive bidding. Although General Engineering requires the Court to liberally construe the applicable statutory and regulatory authority to provide the Government with flexibility in procuring services, it does not mandate a blanket exception for design/build contracts. It is clear from the court's examination of the relevant facts in *General Engineering*, as well as its analysis of the facts in *Autotote* and *Waste Management*, that the exemption applies only to highly technical contracts where "the crux of the project package" is an exempt service and the requirement of non-exempt services are merely incidental to the professional services. *Id.* at 43.

■ The contract at issue here does not satisfy these requirements. Unlike the contract in *General Engineering*, the contract in this case does not require contractor financing which might conceivably bring it within an exception to competitive bidding. And, notwithstanding the design component of the prison project, the bulk of the work to be performed in the construction phase will not require the degree of technical skill associated with the integration of the cutting edge technology that was required in these other cases. Rather, the Court finds that after the prison addition and new jail are designed, the contractor will be primarily responsible for actually constructing correctional facilities, which according to the evidence, accounts for approximately 70% of work under the contract. Undoubtedly, this construction will require professional managers and highly skilled artisans. However, all successful construction projects require such skilled craftsman and managers. If the Court were to construe all such construction responsibilities as professional services under the Code and Rules,

the exception for professional services would swallow the requirement of competitive bidding for public works construction projects.[18] Surely, the Legislature did not intend this result.

Unfortunately for all concerned parties, including the Government, the proposers and the people of the Virgin Islands, there is simply no authority in our Territory which permits the procurement of the design/build contract at issue through competitive negotiation. It is unfortunate because the Territory needs these additional facilities, and despite the contentions of Plaintiff, there is no evidence of any collusion or bad faith in the Government's procurement of the contract. Instead, the evidence thus far shows that the Government was merely attempting to expedite the design and construction of these facilities using a procurement procedure that is authorized and commonly used in other jurisdictions. In fact, the federal procurement system authorizes the design-build selection procedures used by the Government in this case.

Under the federal scheme, procuring agencies are given the choice of using what is characterized as the "traditional acquisition approach of design-bid-build" codified at 40 U.S.C. § 541 et seq. (1986) or the design-build approach codified at 41 U.S.C. § 253m (Supp. 1998). The traditional design-bid-build approach essentially mirrors the procurement scheme authorized by Virgin Islands law and discussed above. Under this approach, the Government first negotiates a contract with professional engineers and architects for the design of a facility. 40 U.S.C. § 544 (1986). After the design is completed, the Government separately procures a contract for the construction of the facility in accordance with the competitive bidding requirements contained in 41 U.S.C. § 251 et seq. (1987).

In comparison to the design-bid-build approach, the Federal Government also enacted legislation in 1996 authorizing the acquisition of design-build contracts like the one at issue in this case. This legislation, authorized under 41 U.S.C. § 253m, permits the federal government, when certain criteria are satisfied, to procure

---

[18] In support of their assertion that the instant contract was for professional services, the defendants cite *S & C Corp. v. Hodge*, 25 V.I. 48 (Terr. Ct. 1990). The Court in *Hodge*, however, merely held that a contract for professional services may be procured by negotiation. *Id.* at 53-54. There is nothing in the court's opinion that suggests that a contract like the one at issue here is for professional services.

65

a contract from a single firm to both design and build a facility. Like the procedure used in this case, the two-phase selection process detailed under the Federal Statute requires the Government to first determine which firms would be qualified to execute the project and then evaluates and awards the contract based on detailed proposals and discussions with those firms.[19] 41 U.S.C. §§ 253b, 253m (c).

Though it is clear that the design-build process authorized under the federal contract acquisition legislation is a more efficient procurement system, it is for our Legislature, and not the courts, to decide whether and under what circumstances it should be authorized in the Virgin Islands.

## B. The Agency Authorized to Procure the Contract.

Without belaboring the point, it is abundantly clear that the Commissioner of P & P should have procured the prison project contract. V.I. Code Ann. tit. 31 § 232 (1) (1998) provides: "The Commissioner of Property and Procurement shall purchase or contract for all supplies, materials, equipment and contractual services, in the manner described in this chapter, required by any

---

[19] At the hearing on this matter, C & C raised several contentions concerning the nature of the discussions that are required under our own system of procurement for professional services. *See* V.I. R. & Regs. tit. 31, § 239-8 (1974). Plaintiff argued that Rule 239-8 requires the Government to enter negotiations with each qualified proposer when it procures professional service contracts. The Court disagrees. Rule 239-8 provides in pertinent part:

The Committee shall conduct discussions severally with the firms selected regarding anticipated concepts and the relative utility of alternative methods of approach for furnishing the required services.
 The Committee shall recommend to the Commissioner [of P & P] the selection of the firm it considers meeting the criteria herein mentioned and most likely capable of performing in the best interests of the Government.

*Id.* Contrary to C & C's contentions, Rule 239-8 does not even address negotiation requirements. Rather, the only Rule providing direction concerning the actual negotiation procedure states that P & P's "proper exercise of the negotiating authority would ordinarily require actual negotiations with interested suppliers beyond the solicitation of proposals." V.I. R. & Regs. tit. 31, § 239-2 (1974). In comparison, the acquisition statutes governing the federal government's procurement of professional services contracts expressly provide a negotiation procedure to be used in procuring those contracts. See 40 U.S.C. §§ 443, 544 (1986). Under the federal scheme, the government is required to negotiate with the highest qualified firm and if those negotiations are unsuccessful, then it should negotiate with the second most qualified firm. 40 U.S.C. § 544 (a) (b) (1986). It appears that the negotiation procedure used by the Government in this case was modeled after these Federal Statutes which are inapplicable here.

and all departments, offices, boards, institutions, and other agencies of the Government of the United States Virgin Islands, except the Legislature and the Territorial Court[.]" (Emphasis supplied). In defining this semi-exclusive contracting authority, the Code requires that the "Commissioner of Property and Procurement shall secure competitive bids" when required, or acquire the contract through other means when appropriate. V.I. Code Ann. tit. 31 §§ 235, 236 (1998). Although the use of a selection committee is required when a contract is procured through negotiation under the Rules, the committee's function is to *"recommend* to the Commissioner the selection of the firm[.]" V.I.R. & Regs. Tit. 31, § 239-8 (1974) (emphasis supplied). The Commissioner of P & P, as the contracting officer must ultimately make the decision, and P & P is vested with exclusive authority to conduct the negotiations and award the contract. V. I. R. & Regs. tit. 31, §§ 235-1 (3), 235-72 (a), 239-2 (1974). Similarly, when a public works construction contract is procured by competitive bidding, a board of awards must consider the bid proposals, but award of the contract is "subject to the approval of the Commissioner." V. I. R. & Regs. tit. 31, § 242-24 (1974). Although the Commissioner of P & P may delegate his duties to individuals within P & P, such delegation is subject to approval by the Governor and the designated person must be bonded. V.I. Code Ann. tit. 31 § 250 (1998); *see also* V.I. Code Ann. tit. 3 § 62 (1995) (generally requiring the Commissioners of all executive departments to perform their duties and restricting their ability to delegate those duties). The Court has not been cited, nor is it aware of any authority which permits the Commissioner of P & P to delegate his authority to anyone outside of P & P.

It is clear from the evidence that the Commissioner of P & P did not award or negotiate the contract to Hyde Park. In fact, it was the Selection Committee that "decided to enter into contract negotiations with the team of Hyde Park/Perini."[20] Although the Acting Commissioner of P & P was a member of the Selection Committee, it is undisputed that he rarely appeared at meetings and did not even attend the meeting where this decision was made. Likewise,

---

[20] Pl.'s Ex. 6, 11/5/98 Ltr. from Francis to C & C.

although the Acting Commissioner of P & P briefly attended some negotiation sessions, he was not a formal member of the Negotiation Committee and he candidly acknowledged he did not know what transpired at the meetings. The Court finds it compelling, and notes in fairness to the Acting Commissioner, that he abstained from participating only because he was told that the prison project was turned over to DOJ. This evidence, in addition to evidence that P & P did not maintain a file on the project, leaves no doubt in the Court's mind that P & P played virtually no role in procuring this contract.

The defendants' contentions that the contract was procured by the proper authorities merit only limited discussion. They argue that the P & P Commissioner's participation was unnecessary because the contract was properly procured by the PFA under V.I. Code Ann. tit. 29 § 919, Fourth (I) and (L) (1998). These two subdivisions grant the PFA broad contracting and "other corporate powers" that are consistent with its purposes of borrowing money, issuing bonds, and investing funds. *See* id. The Charter does not reference any purpose or power that would permit the PFA to procure a contract for the design and construction of correctional facilities.

■ Defendants' other contention, while at first blush meritorious, is similarly unavailing. They argue that V.I. Code Ann. tit. 31 § 239 (f) authorized DOJ to contract for the design and construction of the facilities. This Code section provides: "Using agencies may make direct purchases, or contract for supplies, materials, equipment and contractual services in accordance with rules and regulations prescribed by the Commissioner of Property and Procurement and approved by the Governor." Reference to the Rules, however, reveals that this direct contracting authority only applies when the aggregate amount of the contract does not exceed $500. V. I. R. & Regs. tit. 31, § 239-17 (1974).

### C. The Standard for Granting a Preliminary Injunction.

■ The decision of whether to grant or deny a preliminary injunction is in the discretion of the trial court. *Virgin Islands Port Auth. v. Virgin Islands Taxi Ass'n.*, 979 F.Supp. 344, 347 (D.V.I. 1997). "A preliminary injunction is appropriate when '(1) there is a

likelihood that the moving party will succeed on the merits; (2) irreparable injury will befall the moving party if injunctive relief is withheld; (3) the grant of relief will not cause greater harm to the non-moving party; and (4) the public interest is furthered by the Court granting the request for injunctive relief.' The strength of any single factor reduces the necessary showing with regard to the others." *Everett v. Schneider*, 989 F.Supp. 720, 724 (D.V.I. 1997) (citations omitted). Where, as in this case, the injunction will disturb the decision of a contracting officer who has awarded a governmental contract, the court must also weigh three additional interests: "the practical considerations of efficient procurement of supplies for continuing government operation; the public interest in avoiding excessive costs; and the bidder's entitlement to fair treatment through agency adherence to statutes and regulations." *Sea-Land Service, Inc. v. Brown*, 600 F.2d 429, 434 (3rd Cir.1979). These three additional factors are "overlaid upon the normal preliminary injunction considerations described above, enhancing the burden on plaintiff in the procurement setting and cautioning extreme judicial reluctance to enjoin procurement decisions absent manifest necessity to prevent fraud, illegality or gross abuse of discretion." *Hill Int'l, Inc. v. Nat'l R.R. Passenger Corp.*, 957 F.Supp. 548, 556, n. 4 (D.N.J. 1996). Before a reviewing court may weigh these additional factors, however, it must first determine that the contracting officer's decision was irrational or that there is a "showing of clear illegality." *Princeton Combustion Research Lab. v. McCarthy*, 674 F.2d 1016, 1022 (3rd Cir. 1982); *Sea-Land Service, Inc. v. Brown*, 600 F.2d at 434. The Court will address the threshold issue of illegality with its consideration of C & C's likelihood of prevailing on the merits. And, because the Court finds clear illegality in the process, it will address the remaining three additional interest in subdivision three below.

## 1. Likelihood of Success on the Merits

It is likely that C & C will prevail on the merits. Virgin Islands law provides that "[a]ny purchase order or contract executed in violation of this chapter and of the rules and regulations promulgated for its enforcement, shall be null and ineffective. . . ." V.I. Code Ann. tit. 31 § 249 (a) (1998). In this case, the Court has before

it clear and convincing evidence that the Government violated Virgin Islands law in awarding the prison project contract to Hyde Park. Additionally, the evidence shows that the contracting officer who was vested with exclusive authority to procure the contract played virtually no role in the process. Likewise, the contracting officers who actually procured the contract utilized a procedure that was not authorized by law for procuring construction services. These are not minor violations which might rationally be justified by a procuring officer's attempt to render the process more efficient or avoid excessive costs. *Cf. Princeton Combustion Research Lab.,* 674 F.2d at 1022 (contracting officer's failure to comply with required procedure for accepting proposal modifications did not render process clearly illegal); *Sea-Land Service,* 600 F.2d at 434 (contracting officer's acceptance of a bid proposal that was not fully responsive did not constitute abuse of discretion). Instead, these are clear and substantial violations in which the contracting officers completely disregarded the mandatory procedures. Although the evidence also shows that the Government acted with good intentions, it nonetheless appears that because there were clear and significant violations of the procurement statutes, C & C will likely prevail on the merits of this case. *See* V.I. Code Ann. tit. 31 § 249 (a) (1998); *Gen. Eng'g Corp.,* 636 F.Supp. at 40 (stating that contracts executed in violation of statutory bidding requirements are void).

## 2. Irreparable Injury

It is also clear that C & C and the public will suffer irreparable injury if the injunction is not granted. In this regard, the Court remains mindful of C & C's role in this case, not only as a plaintiff in its own right, but also as a representative of the public's interests. *See Creque v. Gov't of the Virgin Islands,* 354 F.Supp. 849, 853 (D.V.I. 1973). In *Creque,* the court observed that the theory which buttresses a disappointed bidder's standing to sue "is the overriding public interest in having the government follow the statutory procedures which have been established by the Legislature for purchasing and procurement. That interest can be properly vindicated only if parties who suffer apparent injury as a product of illegal contracting are permitted to bring suit in the public interest." *Id.* at 851. *See Sea-Land Service,* 600 F.2d at 432 (providing that

"unsuccessful bidder for a government contract had standing to challenge an adverse procurement decision, not only on the basis of his own rights but those of the public as well."); *see also Merrian v. Kunzig*, 476 F.2d 1233, 1240 (3rd Cir. 1973).

Public confidence in the procurement process is imperative in a democratic society. All qualified firms must be given an opportunity to compete fairly in the procurement process. This can only be accomplished by observation of the applicable statutes and agency rules and regulations. Thus, both C & C and the public rightfully expect that the Government will comply with its own procurement laws when it awards any contract. More importantly, when contracts of this magnitude are at issue, and there is evidence that the procurement laws have been violated, public distrust follows. To withhold the injunction under such circumstances would result in a loss of public confidence in the integrity of the procurement system. Thus, the Court finds that C & C and the public would be irreparably harmed if Hyde Park were permitted to proceed under the contract. This factor also weighs in favor of the plaintiff.

### 3. Balancing of Interests and Hardships

The Court also finds that granting a preliminary injunction will not cause greater harm to the defendants. Hyde Park's project executive testified concerning action the firm has taken in anticipation of being awarded the contract. Specifically, the project executive testified that Hyde Park expended a substantial amount of money preparing its proposal, and after executing the contract, submitted letters of intent to two potential subcontractors. The project executive conceded, however, that Hyde Park would have spent the same amount of money preparing the proposal even if it was not ultimately awarded the contract. He further acknowledged that notwithstanding the letters of intent, Hyde Park has not executed binding contracts with the subcontractors because the Government has not yet issued a notice to proceed. It is clear that Hyde Park has not incurred any additional legal obligations as a result of being awarded the contract. And, if Hyde Park ultimately prevails at trial, then it will still perform its obligations under the contract and be compensated for the work. Thus, the firm will likely suffer no adverse consequences if the parties are enjoined from proceeding under the contract.

71

Harm to the Government will primarily result from having to pay additional funds to house inmates in other facilities while the prison project is delayed.[21] However, no amount of money can justify the substantial violations of the procurement statutes which occurred here. Moreover, when the Court balances this pecuniary harm against the public distrust that will be generated if an injunction is not issued, the scales weigh heavily in favor of granting the relief.

Furthermore, with regard to the additional interests that the Court must consider because this case involves the Government's procurement of a contract, the Court finds that this is not merely a case where, as is in *Princeton Combustion Research* and *Sea-Land Service*, the contracting officer violated relatively minor procurement regulations in the interests of efficiency or cost-effectiveness. *See Princeton Combustion Research Lab.*, 674 F.2d at 1022; *Sea-Land Service*, 600 F.2d at 434. Rather, the instant case involves wholesale violations of the applicable procurement laws which, for the reasons stated above, cannot be justified by these interests. Neither can the violations be rationalized as serving the public's interest in avoiding excessive costs. Even if it is shown that the process used could save the Government money, the Court cannot discern how the elimination of the Commissioner of P & P from that process would further this goal. Finally, it is self-evident that all competitors for government contracts are entitled to fair treatment through agency adherence to the applicable statutes and regulations. Again, although minor departures from the procurement regulations might be justified in the name of more compelling interests, clear and significant violations cannot be so justified. Accordingly, upon balancing the relevant hardships and interests, the Court concludes that they weigh in favor of granting the preliminary injunction.

---

[21] The Bureau of Corrections is currently housing almost 200 inmates in stateside prisons under contracts which are costing the Virgin Island Government between $60 and $67 per day for each inmate. Specifically, there are 125 Virgin Islands inmates being housed by the Bureau of Prisons at an average cost of $67.00 per day for each inmate and an additional 67 inmates being housed in a private prison at an average cost of $60.00 per day for each inmate. In comparison, the cost for housing inmates in the Virgin Islands' facilities averages approximately $43.00 per day for each inmate.

### 4. The Public Interest

 Finally, the Court concludes that the issuance of an injunction in the instant case is in the public interest. Although it is in the public interest that a prison addition and jail facility be built expeditiously, it is not in the public interest that this be done in clear contravention and disregard of the applicable laws. Under these circumstances, the Court concludes that the interests of the public in preserving the integrity of the procurement system are best served by suspending the process until the matter is finally resolved. *See id.* Accordingly, although the Court recognizes that it must exercise restraint in interfering with the Government's procurement decisions, such action is required here. *See id.; George & Benjamin Gen. Contractors v. Gov't of the Virgin Islands Dept. of Property and Procurement*, 921 F.Supp. 304, 313 (D.V.I. 1996). The Government cannot, for the sake of expediency, completely ignore its own laws. Such clearly illegal action, albeit well-intended, cannot be condoned.

### IV. CONCLUSION

After carefully considering the matter, the Court finds clear and convincing evidence that the process used by the Government to award a contract for the prison project violated the Territory's procurement laws. Although Virgin Islands law permits the negotiation of professional design services, it requires that public works construction projects be competitively bid. Furthermore, the General Engineering case, relied on by the defendants, does not exempt the instant contract from the competitive bidding requirement or provide a blanket exception to competitive bidding for all design/build contracts. In addition, while the law is clear that the Virgin Islands Department of Property and Procurement was responsible for procuring the contract, the evidence presented shows that department played virtually no role in the process. Although the evidence shows that the Government was attempting to act expeditiously in the interest of the public, there are material and substantial violations of the Territory's procurement laws that will likely result in the contract being declared void.

Accordingly, the Court concludes that it must exercise its discretionary equitable authority and issue a preliminary injunction enjoining further action under the contract.